IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA    :
    :
    v.    :  CRIMINAL ACTION NO.
    :  1:13-CR-183-WSD-JSA
CARLOS MAURICIO HERNANDEZ  :
    :

<u>FINAL REPORT AND RECOMMENDATION</u>

Defendant Carlos Mauricio Hernandez is charged with various immigration-related crimes, including making false statements in a U.S. Passport application [1]. On June 27, 2013, he filed a Motion to Suppress Evidence [16], alleging that evidence obtained during a warrantless search of his residence should be suppressed. Defendant also filed a Preliminary Motion to Suppress Statements [17], alleging that his post-arrest statements to law enforcement were involuntary and in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). The Court convened an evidentiary hearing as to these motions on August 27, 2013 [23], and received post-hearing briefs from the parties [28][35].

As explained below, the Court finds that the law enforcement agents were authorized to search the Defendant's residence on the basis of voluntary consent by a co-resident. The Court also finds that the Defendant voluntarily waived his right to remain silent and made statements to law enforcement and after having been furnished

the necessary warnings.  Thus, the Court **RECOMMENDS** that Defendant's motions [16][17] be **DENIED**.

### FACTS

### A.    The October 24, 2012 Consent Search

On October 24, 2012, various state and federal law enforcement officers were involved in an operation to arrest the Defendant based on an arrest warrant issued by a Gwinnett County, Georgia court.  Transcript of August 27, 2013 Evidentiary Hearing [26] ("Tr.") at 7-9, 65.  The agents saw the Defendant leave his residence in Norcross, Georgia at about 7:00 am that morning and drive away in a truck.  *Id.* at 10.  The agents followed the truck, and pulled over the Defendant and arrested him about mile and half away.  *Id.*  His girlfriend, identified as Miriam Palacios, was in the passenger seat when the agents approached the Defendant's truck.  *Id.* at 10-11, 66.

Three officers approached the Defendant's truck.  Two agents approached the Defendant's side, including one who had drawn and was pointing a firearm at the Defendant.  *Id.* at 85-87.  The Defendant complied with the officers' instructions, and the officers immediately frisked and handcuffed him.  *Id.* at 87-88.  At the same time, another agent approached the passenger side of the truck with his firearm drawn and pointed to the ground.  *Id.* at 66-68.  The agent commanded Ms. Palacios, in English,

2

to show her hands and exit the truck.  *Id.* at 68, 78.  The agent instructed Ms. Palacios to sit on the curb and he remained standing near her.  *Id.* 69, 78.

According to agent testimony, nobody pointed a weapon at Ms. Palacios, yelled at her, threatened her, or promised her anything in exchange for her cooperation in the investigation.  *Id.* at 70.  She seemed alert and cooperative and was not handcuffed or visibly upset.  *Id.*  At one point, she was shaking, and stated that she was cold.  *Id.* at 50, 89-90.  In response, one of the agents allowed Ms. Palacios to sit in front passenger seat of his Ford Explorer, with the door open.  *Id.*  The agent gave her a blanket and turned up the heat.  *Id.*

Meanwhile, the Defendant insisted to the agents that he was not individual they were looking to arrest (Carlos Mauricio Hernandez).  *Id.* at 15.  Rather, he stated that his name was Juan Rodriguez Del Valle and he requested the chance to go back to his residence to retrieve a passport with that name on it.  *Id.*  The agents declined.  *Id.* at 15-16.  Thus, the Defendant instructed Ms. Palacios to take the agents back to the residence and retrieve his passport and/or documents proving his Juan Rodriguez Del Valle identity.  *Id.* at 16-18, 49, 76, 79.  Defendant explained to the agents that Ms. Palacios was his girlfriend and that they resided together at the residence.  *Id.* at 17.

Agents then spoke with Palacios, who spoke mostly Spanish but some English. *Id.* at 18-19. Agent Paul Earl, who speaks Spanish, albeit "not fluently," primarily spoke to Palacios. *Id.* at 19-20. Earl studied Spanish in high school and college, took six months of Spanish training at the Foreign Institute in Arlington, Virginia, and served for two years overseas in a Spanish-speaking country (Colombia). *Id.* In his career, he has explained rights to approximately 50 Spanish speakers who were arrested or interviewed by law enforcement. *Id.* While talking to Agent Earl, Ms. Palacios never asked for an interpreter. *Id.* at 23.

Agent Earl asked Ms. Palacios "if it was okay for her to go back to the residence with us," and "if we could, one, retrieve the passport, two, search for any other documents that may be in the room where they occupied, any drugs and weapons also in the room." *Id.* at 20. Earl also provided Ms. Palacios with a consent-to-search form which was in both Spanish and English. *Id.* Ms. Palacios signed the form and provided consent to search. *Id.* at 20-21; Gov't Ex. 3. This form stated that law enforcement was asking "permission to carry out a complete search" of the particular address, that "I have been informed that I have the right to refuse to give my consent," that "I give this permission voluntarily," and that "I hereby authorize the agents to seize any article that in their opinion could be related to this investigation." Tr. at 20-21; Gov't Ex. 3. In addition, Earl asked Ms. Palacios specifically if she

understood her rights, and she responded that she did.  Tr. at 20-21.[1]  Ms. Palacios herself wrote on the form the specific address of the residence that was the subject of the consent search.  *Id.* at 22.

Agents then drove with Ms. Palacios to the residence, which was a house where multiple individuals lived.  Tr. at 25, 77, 92-93.  Palacios led the agents to the bedroom where the Defendant (and apparently she) lived.  *Id.*  This bedroom contained a queen sized bed, male and female clothes, female personal and hygiene items, and pictures of both the Defendant and Ms. Palacios.  *Id.* at 25-26, 81-82).  Ms. Palacious retrieved Defendant's Rodriguez Del Valle passport from an accordion file. *Id.* at 26.  The agents searched the rest of the bedroom pursuant to her previously-provided consent, and discovered various items of evidence believed to be incriminating to the Defendant at a computer desk in the bedroom.  *Id.* at 72-74.  Ms. Palacios was present during this search and did not revoke her consent or otherwise object.  *Id.* at 53, 73.

### B.   Defendant's Post-Arrest Statements

Defendant was arrested on federal charges on May 30, 2013, at the Gwinnett County Jail.  Tr. at 33-34.  Agent Earl and another agent took custody of the

---

[1] Ms. Palacios signed the consent form under a different name.  The agent observed her sign but did not specifically ask at the time about the different name. The agent generally knew that she went by different names.  Tr. at 21-22.

Defendant and placed him in a vehicle for transport to the federal courthouse in Atlanta. *Id.* The agents restrained the Defendant with handcuffs, ankle shackles and a belly band. *Id.* Agent Earl was unarmed and the other agent's firearm was concealed. *Id.*

Agent Earl immediately advised the Defendant of his *Miranda* rights verbally (in English) by reading from a declaration form, and Agent Earl provided the Defendant a written declaration of those same rights in Spanish. *Id.* at 35-36, 56-58; Gov't Exs. 12, 13). Agent Earl made sure to immediately advise Defendant of his rights because Agent Earl suspected that "I knew he was going to start talking to us." *Id.* at 35. Agent Earl suspected this because the Defendant had already written them various letters during the several months had been in Gwinnett County Jail. *Id.* Agent Earl instructed the Defendant to take some time and read the form. *Id.* at 35-36. The Defendant appeared to understand, and specifically confirmed that he understood the conversation when Agent Earl inquired. *Id.* at 35-36. Agent Earl did not ask the Defendant to sign the form in the car, because he did not want to hand the Defendant a pen while they were driving. *Id.* at 36. The Defendant signed the form upon arrival at the U.S. Marshal's processing area in the federal courthouse. *Id.* The Defendant did not ask for an attorney or invoke a right to remain silent or ask for an interpreter. *Id.* at 36-37.

During the ride to the federal courthouse, after having been advised of his rights and provided the *Miranda* form, but before the Defendant formally signed the *Miranda* waiver, the Defendant began talking about the case.  Tr. at 37. He did so on his own, and not in response to questions.  *Id.*  At first, he stated that "this was all a big misunderstanding," that he was really "Juan Rodriguez," and that he had a valid U.S. Passport.  *Id.*  Agent Earl responded that "we've checked everything. We are well aware of who you are.  And I even said to him, I go, I even know where the true Juan Rodriguez is."  *Id.*  Agent Earl further stated "it would behoove you to tell the truth."  *Id.* at 38.

At this point, the Defendant stated that he wanted to tell the truth, he admitted he was not Juan Rodriguez[2], and he made various other incriminating statements including that he paid for false papers in the Juan Rodriguez identity.  *Id.* at 38-40. This entire conversation, which lasted about 35-40 minutes, was in English.[3]  *Id.* Subsequently, when the agents presented the Defendant with the *Miranda* waiver form at the courthouse, he asked in what name he should sign.  *Id.* at 41-42.  Agent Earl advised him to sign his true name, and the Defendant signed "Carlos Hernandez."  *Id.*

---

[2] Defendant stated that his name was Carlos Humberto Hernandez Guerra.  *Id.* at 39.

[3] The Defendant, signing as Juan Rodriguez, had also sent several lengthy letters to law enforcement while in Gwinnett County jail, all of which were in English.  Gov't Exs. 10, 11, 16.

During these conversations, the Defendant was alert, calm, and acted appropriately. *Id.* at 42.

## ANALYSIS

### A.    The October 24, 2012 Search Was Based on The Voluntary Consent Of A Co-Habitant

The agents searched the Defendant's and Palacios's apartment based on Palacios's consent.  The evidence shows that this consent was voluntary and that Palacios as a co-resident had authority to consent.  The Defendant had not specifically consented to a full search of the apartment but he had not declined or refused such consent either.  The search was permissible and the motion to suppress should be denied.

### 1.    Ms. Palacios Possessed Authority To Consent Or At Least The Agents Had An Objectively Reasonable Basis To Believe So

Permission to conduct a warrantless search of property owned or occupied by a defendant may be obtained from another person who also owns or occupies or otherwise shares common authority over the premises.  *See United States v. Matlock*, 415 U.S. 164, 171 (1974) (Concept of third-party consent derives from "the mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the coinhabitants has the

right to perform the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.")

Defendant first argues that the agents lacked any reasonable belief that Ms. Palacios lived at and possessed authority to consent to a search of the residence. According to Defendant, "no one knew whether Ms. Palacios lived there," and "[t]here is no evidence that [Defendant] ever stated that Ms. Palacios resided with him." Def. Post Hearing Brief [28] ("Def. Br.") at 8. That statement is simply inaccurate. According to the agents' testimony, Defendant himself told the agents that Ms. Palacios lived with him at the residence:

> Q.    Did he tell you whether he was in a relationship with her?
>
> A.    Yeah, he said that she was his girlfriend.
>
> Q.    Did he (verbatim) say where she lived?
>
> A.    She said that they lived together at the Light Circle address.
>
> Q.    She said or he said?
>
> A.    He said.

Tr. at 17.

The testimony cited by the Defendant for the proposition that "no one knew whether Ms. Palacios lived there" related to the agents' knowledge prior to the traffic stop. *See* Def. Br. [28], citing Tr. at 44 ("Q.  Had Ms. Palacios been seen at the

residence before?  A.  I don't know that"), 77 ("Q.  Okay. Prior to that morning did you know if Ms. Palacios resided at that residence?   A.  I knew there was a number of occupants residing at that residence, but I couldn't confirm who actually resided at that residence.") Regardless of whether the agents previously knew that Ms. Palacios lived at the residence, according to the testimony Defendant himself told the agents during the traffic stop that she did.

Other facts corroborated the Defendant's clear statement that "they lived together at the Light Circle address."  Tr. at 17.  In entering the house–which apparently contained multiple bedrooms rented by different occupants–Ms. Palacios led the agents to a side door that led to the basement and then directly to the right bedroom.  Tr. at 54, 79-80.  While the agents could not recall whether she used a key, she apparently knew how to gain access, because she led the way and the agents did not have to force doors open.  *Id.*  Once in the room, Palacios knew her way around enough to retrieve the passport that the Defendant had instructed her to retrieve.  Tr. at 26.  And the bedroom contained queen sized bed, female clothes and effects, and photographs of Palacios.  *Id.* at 25-26, 81-82.

Thus, the totality of the circumstances confirmed what Defendant told the agents, that is, that Palacios lived with him at the premises.  At a minimum, the agents had a reasonable basis to believe as much.  *See United States v. Brazel*, 102 F.3d 1120,

1148 (11th Cir. 1997) ("And even if the consenting party does not, in fact, have the requisite relationship to the premises, there is no Fourth Amendment violation if an officer has an objectively reasonable, though mistaken, good-faith belief that [] he has obtained valid consent to search the area.") The Government has established Palacios's authority to consent.[4]

## 2.    Ms. Palacios's Consent Was Voluntary

"In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). The Court must examine the totality of the circumstances. *United States v. Tovar-Rico*, 61 F.3d 1529, 1535 (11th Cir. 1995); *see also United*

_____

[4] Defendant states that he "was never asked for his consent for a broader search [beyond his instruction to Ms. Palacios to retrieve his passport], and was not in a position to object to Ms. Palacios's consent." Def. Br. at 8. It is unclear whether Defendant asserts this as a legal argument. While one resident's consent may not be a valid basis to search a residence if another resident expressly objects to the search, *see Georgia v. Randolph*, 547 U.S. 103 (2006), Defendant here never objected. Nor does Defendant cite any authority for the notion that law enforcement must give him an opportunity to object to his cohabitant's consent. *Randolph* itself says otherwise. In *Randolph*, the Court stated that the "fine line" it was drawing was this: "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice ... whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." *Randolph*, 527 U.S. at 121. *Randolph* carved out a potential exception, where "the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." *Id.* Defendant does not argue that this exception applies here, and the Court cannot find *sua sponte* on this record that the agents' separation of Palacios and the Defendant during the traffic stop was for this purpose.

*States v. Gonzalez*, 71 F.3d 819, 828-32 (11th Cir. 1996) (illustrating factors properly to be considered in totality of circumstances inquiry).  Further, "'[t]he government bears the burden of proving . . . that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.'"  *United States v. Hidalgo*, 7 F.3d 1566, 1571 (11th Cir. 1993) (*quoting United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989)).  The absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that "[w]here there is coercion, there cannot be consent." *Gonzalez*, 71 F.3d at 828  (quoting *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968)).  *See also Florida v. Bostick*, 501 U.S. 429, 438  (1991) ("'Consent' that is the product of official intimidation . . .  is not consent at all.").

The Eleventh Circuit has, on prior occasions, identified a non-exhaustive list of relevant factors to consider when making the assessment of whether consent to a warrantless search is voluntary: the consenting individual's custodial status, the presence of coercive police procedures, the extent and level of the consenting individual's cooperation with police, the consenting individual's awareness of his right to refuse to consent to the search, the consenting individual's education and intelligence, and, significantly, the consenting individual's belief that no incriminating evidence will be found.  *See United States v. Blake*, 888 F.2d 795, 798-9 (11th Cir. 1989).

The Court finds that Ms. Palacios's consent was voluntary. According to Agent Earl's uncontradicted testimony, he asked Ms. Palacios if it "would be okay" for her to take them back to the residence and for permission to conduct a complete search. She said yes, both orally and in the form of executing the consent-to-search form. Tr. at 20-21. The search form stated, in English and Spanish, that "I have been informed that I have the right to refuse to give my consent," that "I give this permission voluntarily," and that "I hereby authorize the agents to seize any article that in their opinion could be related to this investigation." Tr. at 20-21; Gov't Ex. 3 Agent Earl specifically asked Ms. Palacios if she understood her rights, and "she said, I understand." *Id.*

Defendant alleges that a language barrier existed. Agent Earl explained that Ms. Palacios understood "some English," but that most of the conversation with her was in Spanish, which he spoke although "not fluently." Tr. at 18-19. The lack of perfect fluency is certainly a factor in assessing whether the Government has met its burden to show voluntariness. In the totality of circumstances, however, the Court finds that Ms. Palacios understood sufficiently to provide voluntary consent.

First, not only did Agent Earl speak to Ms. Palacios in Spanish based on his years of Spanish training and service in Spanish-speaking countries, but he also provided Ms. Palacios a bilingual consent-to-search form. Even assuming some

confusion in understanding from Agent Earl's lack of complete fluency the form made clear, in Spanish and English, that Ms. Palacios had the right to refuse consent and that by signing she was consenting voluntarily.

Second, in determining whether language skills inhibited an individual from providing voluntary consent, courts examine whether the individual interacted intelligently with the police. *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999) (*Citing United States v. Galvan–Muro*, 141 F.3d 904, 907 (8th Cir.1998) (holding that defendant had necessary understanding of English where officer testified that defendant had no trouble understanding officer's questions and defendant answered officer's questions "quickly and with some elaboration"); *United States v. Carrate*, 122 F.3d 666, 670 (8th Cir.1997) (holding that defendant had necessary understanding of English where he gave appropriate responses to officers' questions); *United States v. Perez*, 37 F.3d 510, 515 (9th Cir.1994) (same); *United States v. Sanchez–Valderuten*, 11 F.3d 985, 991 (10th Cir.1993) (holding that defendant had necessary understanding of English where he produced driver's license and registration immediately upon request and appropriately responded to officers' questions regarding his travel plans)).

Here, Ms. Palacios appropriately responded to commands and questions. She got down on the curb when instructed to do so. She explained that she was cold, when

asked why she was shivering.  She executed the consent-to-search form in a correct

manner, and she herself wrote down the address of the premises.  Tr. at 20, 22.  In

fact, Ms. Palacios started to spell the street name wrong, had to cross out the error, and

subsequently was able to follow the agents' direction to place her initials next to the

correction.  *Id.*  After all that, Ms. Palacios was able to lead the agents back to the

residence.  Most importantly, when asked whether she understood her rights, she did

not remain mute, answer inappropriately, or appear confused by the question.  Rather,

"she said, I understand."  Tr. at 21.[5]

Defendant also points to other circumstances, including that Palacios was

"removed from the truck at gunpoint," "told to sit on the ground while an officer, with

a gun, stands over her," and "separated from Mr. Hernandez...."  Def. Br. at 9.  All of

---

[5] This record distinguishes this case from those cited by Defendant.  In *United States v. Farias*, 43 F.Supp.2d 1276 (D. Utah 1999), the record revealed numerous instances where communication broke down between the defendant and law enforcement, including failures to respond.  In *United States v. Garcia-Rosales*, No. CR-05-402, 2006 WL 468320 (D.Or. Feb. 27, 2006), the court relied on numerous factors undermining the existence of voluntary consent, only one of which was a language issue.  In that case, the record included evidence suggesting confusion and lack of understanding, the alleged consentor testified to not understanding the agent's poor Spanish, and the alleged consentor refused several times to execute a consent form.  *Id.* Here, by contrast, the record supports a finding that Ms. Palacios understood and interacted without confusion with the agents, and she signed a bilingual consent-to-search form.  The mere fact that Agent Earl acknowledged his lack of complete Spanish fluency does not itself vitiate voluntariness on this record.

these facts are valid factors to weigh. But the totality of the circumstances still establishes voluntariness.

While the circumstances of the traffic stop were no doubt surprising and scary, there was no suggestion of any conduct that would have led Ms. Palacios to believe that she herself was being arrested at the time she consented. After the initial act of separating her from the car, the agents inquired as to whether she was cold, gave her blankets, and put her in a warm car with the door open. According to the uncontradicted testimony of the agents, no one threatened her, pointed a weapon at her, or handcuffed her. And Agent Earl requested consent in a manner that seems suppliant. *See* Tr. at 20-21 ("we asked if it was okay for her to go back to the residence with us ... We asked if we could – if we could, one, retrieve the passport, two search for any other documents that may be in the room where they occupied, any drugs and weapons also in the room.") The record lacks any indication of coercion or intimidation other than the initial command that Ms. Palacios exit the vehicle and sit on the curb.

Ms. Palacios was also cooperative, calm and not crying. Tr. at 70, 74. And there was no indication that any obvious contraband or any documents incriminating Ms. Palacios were found in the house. There is nothing in this record to suggest that Ms. Palacios had any reason to suspect that incriminating evidence would be found

in the search of the apartment. If anything, Ms. Palacios believed that exculpatory information was located there, in the form of the Rodriguez passport that Ms. Palacios retrieved from the accordion file.  There is nothing to suggest that Ms. Palacios knew of the other records located in the computer desk, or that those records would be incriminating.

Finally, and most importantly, she orally and in writing stated that she understood her rights.  In the totality of the circumstances, the record supports a finding of voluntary consent.  Thus, because the officers had received the voluntary consent of an individual who possessed authority to consent, or at least who they reasonably believed possessed such authority, Defendant's motion to suppress evidence must be denied.

### B.    Defendant's Statements Were Voluntarily Made And In Compliance With *Miranda*

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court recognized that custodial interrogations, by their very nature, generate "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467.  To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealing with the accused.  In particular, prior to the initiation of

17

questioning, they must fully apprise the suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires." *Id.*, at 468-70.  Beyond this duty to inform, *Miranda* requires that the police respect the accused's decision to exercise the rights outlined in the warnings. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, [or if he] states that he wants an attorney, the interrogation must cease." *Id.*, at 473-4.

 *Miranda* holds that a defendant may waive effectuation of the rights conveyed in the warnings provided the waiver is made voluntarily, knowingly and intelligently. *Id*. at 444.  The inquiry has two distinct dimensions. *Edwards v. Arizona*, 451 U.S. 477, 482 (1981).  First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. *Bradley v. Nagle*, 212 F.3d 559, 565 (11th Cir. 2000).  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Fare v. Michael C.*, 442 U.S. 707, 725 (1979); *Schneckloth v.*

*Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995). *See also, North Carolina v. Butler*, 441 U.S. 369, 374-5 (1979).

Aside from the dictates of *Miranda*, whether a statement was voluntarily given must be examined in light of the totality of the circumstances.  See *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Hubbard v. Haley*, 317 F.3d 1245, 1252 (11th Cir. 2003).  This totality of the circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of "an essentially free and unconstrained choice."  *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989).  Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police.  *See, e.g., Bustamonte*, 412 U.S. at 226; *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996). However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent. . . ."  *Gonzalez*, 71 F.3d at 828 (citations omitted).

With regard to *Miranda*, the Court finds that the agents properly advised Defendant of his rights, and that he voluntarily and intelligently waived those rights by immediately initiating the conversation about the case.  Before any questioning, Agent Earl read the Defendant his rights, provided the Defendant a Spanish version

of the rights form, told the Defendant to review it, asked the Defendant whether he understood his rights, and the Defendant responded that he understood.  *See* Tr. at 35-37.  The Defendant never invoked his right to remain silent or to an attorney and, by contrast, immediately starting talking about the case.  Tr. at 37.  The Defendant thus fully understood but waived his rights under *Miranda*.  The only reason this waiver was not memorialized in writing prior to arrival at the courthouse was the agent's concern about handing the Defendant a pen while they were driving.   The admissibility of the Defendant's statement cannot turn on such a precaution.

The circumstances here show that the Defendant's decision to waive his *Miranda* rights and speak was voluntary.  The Defendant himself initiated the conversation, to explain that his arrest was a "big misunderstanding."  Indeed, the Defendant had already written the agents several lengthy letters similarly explaining his innocence.  *See* Gov't Exs. 10, 11, 16.  There is little that is more quintessentially voluntary than an attempt to talk oneself out of charges.  All of this combines to establish that his statements in the car on May 30, and his decision to waive his rights by making those statements, were voluntary.

Defendant argues that his statements were "the result of the physically and emotionally intimidating effect of two agents, one of whom clearly expressed what he did and did not believe."  Def. Br. at 14.  The undersigned disagrees.  The record

shows no such intimidation.  That the Defendant was subject to ordinary handcuffs and other restraints, as a prisoner being transported to court, was not something that would overbear the Defendant's free will.  Indeed, far from being intimidated by these circumstances into involuntarily confessing, the Defendant's initial tactic was to falsely assert his innocence.

The Defendant also did not confess during some lengthy period of isolation. To the contrary, he was in a car on the way to be presented to a judge in open court and to begin defense of his case.  And, importantly, the Defendant himself initiated the entire conversation, with self-serving denials.  All the agents did was place the Defendant in the car and read him his rights, to which the Defendant responded by blurting out his defense, that is, that it was a "big misunderstanding" and that he was really Juan Rodriguez.

To the extent Defendant argues that the agents improperly pressured him into confessing against his will by telling him that they knew he was lying, that is unavailing.  Merely confronting a Defendant with evidence of his false statements does not render a subsequent confession involuntary.  Nor is encouraging a Defendant to tell the truth a coercive tactic that deprives a confession of voluntariness.  *See United States v. Mendoza–Cecelia*, 963 F.2d 1467 (11th Cir.1992) (informing a suspect of realistic penalties and encouraging him to tell the truth does not render a

confession involuntary).[6]   Again, here, the Defendant himself initiated the entire conversation by lying, and all the agents did was point out that they knew he was lying.  That did not violate the Fifth Amendment or *Miranda*.  Defendant's motion to suppress statements should be denied.

## CONCLUSION

Thus, the undersigned **RECOMMENDS** that the Defendant's Motion to Suppress Evidence [16] and Motion to Suppress Statements [17] be **DENIED**.  This matter is **READY FOR TRIAL**.


**IT IS SO ORDERED** this 13th day of December, 2013.


_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE

---

[6] A frequently litigated question is whether officers engage in "interrogation," within the meaning of *Miranda*, by confronting a Defendant with specific evidence discovered against him.  That question is irrelevant here, because the agents had already informed the Defendant of his *Miranda* rights, and he had already acknowledged his understanding of those rights, before this entire discussion.  Thus, even assuming the statements constituted interrogation, that interrogation was in compliance with *Miranda*.